**In re: VERIZON INTERNET SERVICES, INC., Subpoena Enforcement Matter,**

**Recording Industry Association of America, Plaintiff,**

**v.**

**Verizon Internet Services, Defendant.**

**No. CIV.A. 03–MS–0040 JDB.**

United States District Court, District of Columbia.

April 24, 2003.

---

10. An Order consistent with the Court's rul-
ing accompanies this Memorandum Opinion.

Donald B. Verrilli, Jr., Thomas Perrelli, Jenner & Block, Recording Industry Association of America, Jonathan Whitehead, Recording Industry, Association of America, Washington, for Plaintiff.

Andrew McBride, Bruce Joseph, Dineen Wasylik, Wiley Rein & Fielding, Washington, for Defendant.

Kathryn Schaefer Zecca, Robbins, Russell, Englert, Orseck & Untereiner, U.S. Internet Industry Association, Megan Gray, Gray Matters, Paul Benedict Gaffney, Edward Bennett Williams Building, Williams & Connolly, Joe Caldwell, Jr., Baker Botts, LLP, The Warner Building, Electronic Privacy Information Center, Washington, for Amici.

John Zacharia, United States Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Intervenor.

### MEMORANDUM OPINION

BATES, District Judge.

Before the Court is the motion of Verizon Internet Services ("Verizon") to quash the February 4, 2003 subpoena served on it by the Recording Industry Association of America ("RIAA") pursuant to the Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. § 512. On behalf of copyright owners, RIAA seeks the identity of an anonymous user of the conduit functions of Verizon's Internet service who is alleged to have infringed copyrights by offering hundreds of songs for downloading over the Internet.[1] In an earlier action, this Court rejected Verizon's statutory challenges to a similar subpoena, holding that Verizon's conduit functions were within the scope of the subpoena authority of § 512(h) of the DMCA. *See In re: Verizon Internet Services, Inc., Subpeona Enforcement Matter,* 240 F.Supp.2d 24 (D.D.C.2003). Verizon now claims that § 512(h) violates

---

1. RIAA is the industry trade association for sound and music recordings, and is authorized to enforce the copyrights of its members, who create and distribute most of the music sold in the United States.

Article III of the Constitution because it authorizes federal courts to issue binding process in the absence of a pending case or controversy, and that § 512(h) violates the First Amendment rights of Internet users. If the merits of Verizon's constitutional challenges are rejected by this Court, Verizon seeks a stay pending appeal of that ruling, and of the earlier statutory ruling by this Court.

Having considered the parties' several memoranda, three hearings, the brief of the United States as intervenor defending the constitutionality of § 512(h), a number of *amicus* briefs, and the entire record herein, the Court denies Verizon's motion to quash RIAA's February 4, 2003 subpoena. The subpoena power authorized under § 512(h) of the DMCA does not violate the case or controversy requirement of Article III and does not abridge the First Amendment rights of Internet users. Moreover, because Verizon is unable to show irreparable harm or that it is likely to succeed on an appeal of its constitutional or statutory challenges, the Court also denies Verizon's request for a stay pending appeal.[2]

## I. PROCEDURAL HISTORY

This case has followed a somewhat circuitous procedural path. To begin with, this is the second subpoena RIAA has served on Verizon pursuant to the DMCA seeking the identity of an anonymous Internet user alleged to have infringed protected copyrights. On July 24, 2002, RIAA served its first subpoena to obtain the identity of a Verizon subscriber alleged to have made more than 600 copyrighted songs available for downloading over the Internet through peer-to-peer file transfer software provided by KaZaA. Verizon claimed that be-

cause RIAA's subpoena related to material transmitted over Verizon's network—rather than stored on it—it fell outside the scope of the subpoena power authorized by § 512(h). Verizon read § 512(h) as applying only in those situations where the infringing material is physically stored on the service provider's network. RIAA contended that the subpoena authority under § 512(h) applied to all service providers under the DMCA, including Verizon. The parties framed the issue as one of statutory construction, although Verizon noted that if § 512(h)'s subpoena authority were construed as applying to all service providers, the statute "raises substantial questions" under Article III and the First Amendment.

The Court construed the subpoena power in § 512(h) as applying to all service providers under the DMCA, and granted RIAA's motion to enforce the subpoena. *See In re: Verizon Internet Services, Inc.*, 240 F.Supp.2d 24 (hereinafter *"First Subpoena Decision"*). The Court did not reach the constitutional arguments, instead deciding the question strictly on statutory grounds by construing the DMCA's language, structure, purpose, and legislative history. As a result, the Court found the subpoena valid and ordered Verizon expeditiously to provide RIAA with the identity of the subscriber alleged to be infringing copyrighted songs.

Verizon appealed that decision, and moved to stay the Court's order pending resolution of its appeal.[3] In its motion for a stay, Verizon asserted constitutional challenges as the primary basis for a stay, claiming that the Court's construction of § 512(h) raised serious questions regarding the First Amendment rights of Inter-

---

**2.** A temporary stay of 14 days will be entered to enable Verizon to seek a stay in the Court of Appeals.

**3.** Pursuant to Fed. R.App. P. 8(a), this Court ordered a temporary stay to allow the issues to be fully briefed and decided.

net users and presented a critical issue whether a subpoena could issue under Article III without an actual "case or controversy" pending in federal court. RIAA contended that because Verizon had not raised these issues earlier, it had waived them on appeal.

The Court held a hearing on Verizon's stay motion. Meanwhile, however, RIAA served a *second* subpoena on Verizon on February 4, 2003. Shortly after the hearing on its motion to stay the first subpoena, Verizon moved to quash RIAA's second subpoena, directly presenting the constitutional challenges.[4] In an effort to resolve both the motion to stay on the first subpoena and the constitutional challenges to the second subpoena, the Court ordered another round of expedited briefing. Verizon proposed notifying the two subscribers whose conduct is at issue of the commencement and status of these actions, and the nature of RIAA's allegations of copyright infringement, which was then done at the Court's urging. A third hearing to address Verizon's constitutional challenges to § 512(h) was held on April 1, 2003. Subsequently, the United States has moved, and been permitted, to intervene and has submitted a brief defending the constitutionality of the DMCA.

The gravamen of Verizon's statutory challenge to the first subpoena was that the subpoena power under § 512(h) should be construed as limited to situations within § 512(c) where allegedly infringing material is stored on the Internet service provider's network. This Court firmly rejected that view in *First Subpoena Decision*, 240 F.Supp.2d 24. The constitutional challenges now asserted by Verizon in response to the second RIAA subpoena are, although substantive and in apparent good faith, somewhat in tension with the earlier statutory challenge. If Verizon were correct that § 512(h) should be construed to permit subpoenas only for subsection (c) service providers—which it is not—Verizon's Article III challenge would nonetheless retain its full force because such subpoenas would still, under Verizon's view, be unconnected to a pending case or controversy, and the asserted First Amendment concerns would also remain, albeit focused on the more limited subset of subscribers of subsection (c) service providers. Given this tension, one might ask why the constitutional challenges were not more fully pressed by Verizon in the first subpoena litigation. Be that as it may, those issues are now squarely before the Court in this case.[5]

## II. SECTION 512(h) DOES NOT VIOLATE ARTICLE III

■ Verizon contends that § 512(h) violates Article III of the Constitution because it authorizes federal courts to issue subpoenas in the absence of a pending case or controversy. Citing cases from the eighteenth and nineteenth centuries, Verizon argues that federal judges can neither exercise authority outside the context of an actual case or controversy nor undertake non-judicial functions. *See Hayburn's Case*, 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792); *United States v. Ferreira*, 54 U.S. 40, 13 How. 40, 14 L.Ed. 40 (1851). Relying on *United States Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 108 S.Ct. 2268, 101 L.Ed.2d 69

---

4. Because the second subpoena involved the same parties as the first subpoena and related legal issues, Verizon's motion to quash was assigned to this judge with the agreement of both Verizon and RIAA.

5. Because the *First Subpoena Decision* provided an extensive overview of § 512 of the DMCA, the Court will not repeat that explanation here, and instead incorporates that background discussion by reference.

(1988), and *Houston Business Journal, Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208 (D.C.Cir.1996), Verizon also argues more specifically that "the power to issue subpoenas exists only in the context of a case that is properly pending before a federal court." Verizon's Br. Supp. Mot. Quash Feb. 4, 2003 Subpoena at 12.[6]

Verizon's arguments, although intriguing, are ultimately not persuasive. No doubt the justices of the Supreme Court have indicated that the federal courts are properly confined to the exercise of "judicial power." *See Hayburn's Case*, 2 U.S. at 410 n. *, 2 Dall. 409; *Ferreira*, 54 U.S. at 48, 13 How. 40.[7] And, more recently, the Supreme Court has noted that "[f]ederal judicial power itself extends only to adjudication of cases and controversies and it is natural that its investigative powers should be jealously confined to these ends." *United States v. Morton Salt Co.*, 338 U.S. 632, 641–642, 70 S.Ct. 357, 94 L.Ed. 401 (1950). But upon examination, it is clear that the § 512(h) subpoena authorization does not represent an innovation that is inconsistent with the limited role of the judiciary as it has traditionally been understood in our constitutional regime.

As an initial matter, the clerk's issuance of a § 512(h) subpoena does not involve either the exercise of judicial power or the exercise by federal judges of Article I or Article II-type investigatory power. Indeed, the issuance of a § 512(h) subpoena cannot properly be considered an act of "the court." Subsection (h)(4) provides that "[i]f the notification [of claimed infringement] filed satisfies the provisions of subsection (c)(3)(A), the proposed subpoena is in proper form, and the accompanying declaration is properly executed, the clerk **shall** expeditiously issue and sign the proposed subpoena and return it to the requester for delivery to the service provider." 17 U.S.C. § 512(h)(4) (emphasis added). Under this subsection, the clerk exercises no discretion; if the requirements are met, the subpoena must be issued. The clerk, in other words, executes a quintessentially ministerial duty. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498, 18 L.Ed. 437 (1866) ("A ministerial duty ... is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law."); *Nealon v. Davis*, 18 F.2d 175, 176 (D.C.Cir.1927) ("A ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of his own judgment upon the propriety of the act being done." (citation and internal quotation marks omitted)). In fact, the legis-

---

**6.** To be clear, Verizon does not contend that the instant proceeding to quash a subpoena is not a case or controversy; rather, Verizon contends that the issuance of the subpoena under § 512(h) does not constitute, and was not conducted in the context of, a case or controversy. It is well-established that courts may hear an action to enforce or quash a subpoena even where the subpoena was not issued in connection with a case pending in the federal courts. *See ICC v. Brimson*, 154 U.S. 447, 490, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894) (courts may aid inquiries before the ICC); *United States v. Hill*, 694 F.2d 258, 269 (D.C.Cir.1982) (court has jurisdiction to en-

force investigatory subpoenas issued by the Department of Energy).

**7.** The Supreme Court itself did not reach the constitutional issue in *Hayburn's Case*, but the opinions of several Circuit Courts (on which certain Justices of the Supreme Court sat) "were reported in the margins of the Court's decision in that case, and have since been taken to reflect a proper understanding of the role of the Judiciary under the Constitution." *Morrison v. Olson*, 487 U.S. 654, 678 n. 15, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988)

lative history of § 512(h) indicates that Congress specifically intended the issuance of the subpoena to "be a ministerial function." S.Rep. No. 105–190, at 51 (1998).

Stretching back to the days of Chief Justice Marshall, the Supreme Court has repeatedly distinguished between actions that are ministerial in nature and those that constitute an exercise of judicial, legislative, or discretionary executive power. *See, e.g., Custiss v. Georgetown & Alexandria Turnpike Co.,* 6 Cranch 233, 10 U.S. 233, 237, 3 L.Ed. 209 (1810) (Marshall, C.J.) (clerk's act of recording an inquisition signed by marshal and jurymen is a "ministerial act which the law directs the clerk to perform ... and requires no exercise of judicial functions"); *Elliot v. Lessee of William Peirsol,* 26 U.S. 328, 341, 1 Pet. 328, 7 L.Ed. 164 (1828) (in making and recording a certificate of acknowledgment of a deed, clerk of court "acted ministerially, and not judicially"); *Ex parte Virginia,* 100 U.S. 339, 348, 10 Otto 339, 25 L.Ed. 676 (1879) (selection of jurors "surely is not a judicial act" but "is merely a ministerial act"); *Central Loan & Trust Co. v. Campbell Comm'n Co.,* 173 U.S. 84, 95, 19 S.Ct. 346, 43 L.Ed. 623 (1899) (probate judge's grant of an order for attachment did "not involve the discharge of a judicial function but merely the performance of a ministerial duty"); *ICC v. Chicago Great W. Ry. Co.,* 209 U.S. 108, 117–18, 28 S.Ct. 493, 52 L.Ed. 705 (1908) (positing distinction between duties that are "ministerial, and therefore such as may legally be imposed upon a ministerial body" and those that are "legislative, and therefore, under the Federal Constitution, a matter for congressional action"); *Wells v. Roper,* 246 U.S. 335, 338, 38 S.Ct. 317, 62 L.Ed. 755 (1918) (decision by Postmaster General and his deputy to cancel contract "was executive in character, not ministerial, and required an exercise of official discretion"); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 479, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (District of Columbia Court of Appeals acted judicially, not ministerially, in considering petitions for waiver of bar admission requirements).[8] Chief Justice Marshall specifically noted in *Custiss* that "the legislature may direct the clerk of a court to perform a specified service, without making his act the act of the court." 10 U.S. at 236, 6 Cranch 233.

Here, the fact that Congress has directed an employee of the judicial branch to carry out a specific non-discretionary function neither implicates Article III judicial power nor involves federal judges in an investigation of the sort properly relegated to one of the other branches. In a real-world sense, no Article III judge takes any action with respect to a § 512(h) subpoena until the copyright holder moves to enforce the subpoena or the service provider moves to quash it—at which time there is a concrete controversy sufficient to confer jurisdiction under Article III of the Constitution.

Verizon objects to this line of analysis, arguing that a § 512(h) subpoena is issued in the name of the district court and thus should be treated as an act of the court. And, indeed, it is true that because the procedures in Fed.R.Civ.P. 45 governing enforcement of a subpoena *duces tecum* are applicable to a § 512(h) subpoena, *see* 17 U.S.C. § 512(h)(6), a service provider's failure to comply with a § 512(h) subpoena could, like a failure to comply with a Rule

---

**8.** *See also Dornan v. Sanchez,* 978 F.Supp. 1315, 1326 (C.D.Cal.1997) (court's issuance of subpoenas in connection with election contest to be adjudicated by House of Representatives is a "ministerial" function that does not require the court to "exercise its own judicial power").

45 subpoena, be construed as a violation of a court order, providing a basis for contempt sanctions. *See Waste Conversion, Inc. v. Rollins Envtl. Servs. (NJ). Inc.,* 893 F.2d 605, 608 (3d Cir.1990) (en banc) (assuming "for purposes of this appeal," that failure to comply with a Rule 45 subpoena for testimony could subject a person to criminal contempt); *Fisher v. Marubeni Cotton Corp.,* 526 F.2d 1338, 1340 (8th Cir.1975) ("A subpoena is a lawfully issued mandate of the court issued by the clerk thereof."); Fed.R.Civ.P. 45 advisory committee notes for 1991 amendment ("Although the subpoena is in a sense the command of the attorney who completes the form, defiance of a subpoena is nevertheless an act in defiance of a court order and exposes the defiant witness to contempt sanctions."). But even in the Rule 45 context, courts recognize that a subpoena issued upon express order of a judge and a subpoena issued by the clerk of the court are not equivalent. *See Waste Conversion,* 893 F.2d at 608 ("A subpoena, obtainable as of course from the Clerk of the Court, is not of the same order as one issued by a judicial officer in the resolution of a specific dispute."); *Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1364 (2d Cir.1991) (same); Fed.R.Civ.P. 45 advisory committee notes for 1991 amendment ("But, because the command of the subpoena is not in fact one uttered by a judicial officer, contempt should be very sparingly applied when the nonparty witness has been overborne by a party or attorney."); *see also Doe v. DiGenova,* 779 F.2d 74, 85 (D.C.Cir.1985) (grand jury subpoena is not an "order of a court" unless specifically approved by a court). The better view here is that because the issuance of a § 512(h) subpoena is a ministerial task accomplished without judicial involvement, it does not implicate Article III judicial power or improperly place federal judges in an investigatory role.

In any event, assuming that the issuance of a § 512(h) subpoena can be conceptualized as a judicial act, Verizon's challenge still fails. In the first place, § 512(h) is by no means as unique as Verizon claims. Congress has enacted several provisions that specifically authorize the clerk of the district court to issue subpoenas despite the absence of a pending case or controversy in the federal courts. *See, e.g.,* 2 U.S.C. § 388 (subpoenas for depositions in connection with proceedings in the House of Representatives); 35 U.S.C. § 24 (subpoenas for evidence to be used in connection with proceedings in Patent and Trademark Office); 45 U.S.C. § 157(h) (subpoenas at the request of arbitrators under the Railway Labor Act); 7 U.S.C. § 2354(a) (subpoenas for evidence to be used in connection with proceedings in Plant Variety Protection Office). Moreover, these provisions are not recent innovations but rather were firmly established by the time that § 512(h) was enacted in 1998. *See Dornan,* 978 F.Supp. at 1319 (noting that precursor to 2 U.S.C. § 388 was enacted in 1798); Act of July 8, 1870, ch. 230, § 44, 16 Stat. 204 (original source of 35 U.S.C. § 24); Railway Labor Act, ch. 347, § 7, 44 Stat. 577 (1926) (original source of 45 U.S.C. § 157(h)); Pub.L. 91–577, tit. I, § 24, 84 Stat. 1544 (1970) (original source of 7 U.S.C. § 2354(a)).

But even setting aside these particular provisions, it is clear that "federal courts and judges have long performed a variety of functions that ... do not necessarily or directly involve adversarial proceedings within a trial or appellate court." *Morrison,* 487 U.S. at 681 n. 20, 108 S.Ct. 2597; *see also United States v. Reagan,* 453 F.2d 165, 173 n. 4 (6th Cir.1971) ("The invocation of judicial power prior to formal charges being made or before filing suit is indeed a common practice in our jurisprudence."). In the criminal context, for ex-

ample, courts issue warrants, *see* Fed. R.Crim.P. 41, and review applications for wire taps, *see* 18 U.S.C. §§ 2516, 2518, "both of which may require a court to consider the nature and scope of criminal investigations on the basis of evidence submitted in an *ex parte* proceeding." *Morrison*, 487 U.S. at 681 n. 20, 108 S.Ct. 2597. Courts also assist grand juries in their investigative function by compelling the testimony of witnesses, despite the absence of a traditional adversarial proceeding. *See id.*[9] And Congress has authorized district courts to require testimony or other evidence for use in a foreign tribunal, even where no proceeding is yet pending in that forum. *See* 28 U.S.C. § 1782(a); *In re: Letter Rogatory*, 42 F.3d 308, 310 (5th Cir.1995) ("Congress abrogated the requirement that the foreign litigation actually be pending before relief could be had under § 1782.").[10]

In the civil context, perhaps the most deeply rooted analogue to § 512(h) is Fed. R.Civ.P. 27(a). That provision reflects the traditional powers of the courts at equity dating from even before the adoption of the Constitution, *see Arizona v. California*, 292 U.S. 341, 347, 54 S.Ct. 735, 78 L.Ed. 1298 (1934), and allows a federal court to authorize a person to perpetuate testimony by deposition before an action is filed where doing so would "prevent a failure or delay of justice." Fed.R.Civ.P. 27(a)(3). In order to obtain a Rule 27(a) order, the petitioner seeking testimony must show

1, that the petitioner expects to be a party to an action cognizable in a court of the United States but is presently unable to bring it or cause it to be brought, 2, the subject matter of the expected action and the petitioner's interest therein, 3, the facts which the petitioner desires to establish by the proposed testimony and the reasons for desiring to perpetuate it, 4, the names or a description of the persons the petitioner expects will be adverse parties and their addresses so far as known, and 5, the names and addresses of the persons to be examined and the substance of the testimony which the petitioner expects to elicit from each.

Fed.R.Civ.P. 27(a)(1).

Notably, the requirements for obtaining a § 512(h) subpoena are similarly rigorous. A copyright owner (or a person authorized to act on the owner's behalf) must present to the clerk a proposed subpoena, "a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under [Title 17]," and a copy of the notification of claimed infringement. 17 U.S.C. § 512(h)(1), (2). This notification, in turn, must include "substantially the following":

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

---

9. Verizon baldly asserts that the § 512(h) subpoena context cannot "be analogized to the textually assigned judicial roles of checking Executive power in grand jury investigations and applications for search warrants." *See* Verizon's Reply Br. Supp. Mot. Quash at 2 n. 3 (citing U.S. Const. amends. IV & V). But the proposition that in these settings courts serve to check Executive power does not undermine the overarching fact that the Constitution acknowledges roles for the judiciary outside the context of a classic case or controversy.

10. Moreover, as the United States points out, in the § 1782 setting it is unlikely there will ever be an underlying claim within federal court jurisdiction because the proceeding in the foreign tribunal arises under foreign, not American, law. *See* Br. Intervenor United States at 8.

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

*Id.* § 512(c)(3). Thus, under both Rule 27(a) and § 512(h), private parties may avail themselves of judicial machinery to obtain information prior to the filing of a complaint—but only if they satisfy a specific set of criteria and identify with particularity the information they seek to compel.

For its part, Verizon argues vigorously that Rule 27(a) is not sufficiently analogous to § 512(h) to be instructive. Primarily, Verizon contends that Rule 27(a) is distinguished by its requirement for a clear allegation of intent to file a lawsuit. *See* 8 Charles A. Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice and Procedure § 2072 (2d ed.1994). Under § 512(h), Verizon points out, the subpoena application need not even come from the copyright holder—the real party-in-interest with standing to bring a lawsuit. In addition, Verizon argues, Rule 27(a) does not allow actual discovery but only the preservation of evidence where necessary, *see Penn Mut. Life Ins. Co. v. United States,* 68 F.3d 1371, 1376 (D.C.Cir. 1995), and allows the adverse party the opportunity to contest the petition to perpetuate testimony, *see* Fed.R.Civ.P. 27(a)(2).

These differences, however, are neither as substantial nor as consequential as Verizon contends. First, although an entity seeking a subpoena under § 512(h) need not state that it expects to be a party to an action cognizable in federal court, it does have to make a sworn statement of good faith belief that a copyright is being used in an unauthorized manner—a statement largely to the effect that a copyright action cognizable in federal court could be asserted (if not by the party seeking the subpoena then by its principal, the copyright holder). Thus, § 512(h), like Rule 27(a), requires as a prerequisite to court action a significant showing as to the existence of a breach or violation into which the court could ultimately be drawn. Moreover, in neither the Rule 27(a) nor the § 512(h) setting can the court be certain that a judicial action will ever be filed. *See Penn Mut.,* 68 F.3d at 1374 ("[A] party need not demonstrate that litigation is an absolute certainty in order to perpetuate testimony pursuant to Rule 27(a).").

With respect to Verizon's distinction between discovery and preservation of evidence under Rule 27(a), it is undisputed that some service providers (although not Verizon) might log only temporarily the identifying information sought on a § 512(h) subpoena. *See* Tr. of April 1,

2003, Hearing at 14–15; Declaration of Frank Creighton ¶ 16. Hence, § 512(h), like Rule 27(a), provides a method for preserving, not merely discovering, information essential to a potential lawsuit. Also lacking in merit is Verizon's argument that Rule 27(a) is distinguished by the possibility of adversarial proceedings contesting the petition. The alleged infringer may receive no notice of a § 512(h) subpoena before his identity is released, but the entity subpoenaed (the service provider) does have the opportunity to contest the subpoena in federal court before it is enforced. *See, e.g., ALS Scan, Inc. v. RemarQ Communities, Inc.,* 239 F.3d 619 (4th Cir.2001) (action addressing service provider's resistance to DMCA subpoena). In other words, § 512(h) does not authorize an entirely *ex parte* form of judicial compulsion.

Overall then, despite Verizon's objections, Rule 27(a) provides a compelling precedent for judicial compulsion of information outside the context of a pending case or controversy. Furthermore, taking Rule 27(a) together with the other analogues discussed above, there is ample basis for the Court to conclude that the role assigned to the clerk of the court in § 512(h) is countenanced by the Constitution.

Notwithstanding Verizon's contentions, *United States Catholic Conference v. Abortion Rights Mobilization, Inc.,* 487 U.S. 72, 108 S.Ct. 2268, 101 L.Ed.2d 69 (1988), and *Houston Business Journal, Inc. v. Office of the Comptroller of the Currency,* 86 F.3d 1208 (D.C.Cir.1996), do not undermine this conclusion. In *Catholic Conference,* the Supreme Court held that where a district court lacks subject matter jurisdiction over an action, it also lacks power to issue a contempt citation for failure to comply with a subpoena issued in connection with that action. 487 U.S. at 80, 108 S.Ct. 2268. In *Houston Business Journal,* the D.C. Circuit held that a district court lacks power to issue a subpoena when the underlying action is asserted in state, not federal, court. 86 F.3d at 1213.

Importantly, in both *Catholic Conference* and *Houston Business Journal,* the only conceivable source for the district court's jurisdiction to issue a subpoena was a pending case or controversy; it was the absence of a sound federal case or controversy that was thus fatal to the validity of the subpoenas in question. Here, in contrast, Congress has expressly provided the clerk of the court with the authority to issue § 512(h) subpoenas; thus the clerk need not draw upon the powers arising from jurisdiction over a pending case or controversy. Section 512(h) accordingly presents a situation neither expressly contemplated nor ruled out by the holdings in *Catholic Conference* and *Houston Business Journal.* Indeed, the D.C. Circuit implicitly recognized in *Houston Business Journal* that in settings such as Rule 27(a) the federal courts' subpoena power may properly be asserted in the absence of subject matter jurisdiction over an underlying action. *See* 86 F.3d at 1213.

Verizon seeks to bolster its position by arguing that § 512(h) offends the policy concerns that underlie the case-or-controversy requirement. According to Verizon, this requirement "ensures both that the judiciary does not take on non-adjudicatory tasks and that neither Congress nor the Executive attempts to foist non-judicial duties on the Article III courts." Verizon's Br. Supp. Mot. Quash at 5 (emphasis omitted). Duties that are inconsistent with the judicial function, Verizon contends, "undermine public confidence in the independence and impartiality of the judiciary and take the courts' resources away from their primary role." *Id.* By putting the judiciary in the role of the copyright

holder's "investigator," Verizon maintains, § 512(h) implicates both of these concerns.

The Court does not agree. In *Morrison v. Olson,* the Supreme Court identified two principal concerns underlying the general rule, derived from the case-or-controversy requirement, that " 'executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution.' " 487 U.S. at 677, 108 S.Ct. 2597 (quoting *Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). First, the rule "help[s] ensure the independence of the Judicial Branch"; second, it "prevent[s] the Judiciary from encroaching into areas reserved for other branches." *Id.* at 678, 108 S.Ct. 2597.

Neither of these concerns is implicated here. Verizon does not appear to be arguing that the second of these concerns is threatened and, in fact, it is clear enough that the activity under § 512(h) poses no danger of encroachment or aggrandizement. Under § 512(h), the clerk carries out a nondiscretionary duty that allows one private party to retrieve information from another private party. This rather passive, ministerial function by court personnel in no way resembles or impedes upon the authority of the Executive and Legislative Branches to pursue active investigation of possible civil or criminal wrongdoing. As the Supreme Court has noted, the "separation of powers 'left to each [Branch] power to exercise, in some respects, functions in their nature executive, legislative and judicial.' " *Mistretta v. United States,* 488 U.S. 361, 386, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (quoting *Myers v. United States,* 272 U.S. 52, 291,

47 S.Ct. 21 (1926) (Brandeis, J., dissenting)). Here, the minimal role of court personnel in issuing a § 512(h) subpoena "does not pose a sufficient threat of judicial intrusion into matters that are more properly within the Executive's [or Legislature's] authority to require that the Act be invalidated as inconsistent with Article III." *Morrison,* 487 U.S. at 683, 108 S.Ct. 2597.[11]

With respect to the first concern elucidated in *Morrison,* there is simply no basis to conclude that § 512(h) undermines the independence or institutional integrity of the Judicial Branch. Under § 512(h), the district court does not take sides in the copyright holder's request for the alleged infringer's name, but rather, through the clerk, serves as a passive, neutral instrument facilitating the attempt to retrieve the name. Furthermore, an Article III judge does not by virtue of the clerk's action become in any way invested in either the request for the alleged infringer's name or the potential copyright infringement case. The judge will still be able to approach any dispute over the information retrieval or the underlying copyright infringement in an entirely objective, unbiased fashion.

In short, given that the clerk only, and not a federal judge, issues a subpoena, § 512(h) does not "pose[ ] any threat to the 'impartial and independent federal adjudication of claims within the judicial power of the United States.' " *Id.* at 683, 108 S.Ct. 2597 (quoting *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 850, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986)). Any possible public perception that federal judges are being enlisted by copyright

---

11. To the extent that a district court issuing a § 512(h) subpoena is properly understood to be exercising nothing other than a ministerial function, it is worth noting that the Supreme Court in *Morrison* held that the assumption of

"essentially ministerial" powers by a special court under the Ethics in Government Act of 1978 did not impermissibly trespass upon the authority of the Executive Branch. *Id.* at 681, 108 S.Ct. 2597.

holders *ex parte* to investigate possible infringement would be based upon a complete misapprehension of how § 512(h) actually operates, and thus cannot provide a basis for striking down the provision.

There may be some merit, albeit quite limited, to Verizon's argument that § 512(h) foists a burden upon the Article III branch that could impede the judiciary's ability to perform its primary function—adjudication. Although no federal judge need allocate his or her time to issuing § 512(h) subpoenas, if, as Verizon hypothesizes, copyright holders start to present the clerks of the federal courts with tens of thousands of subpoena requests, some strain on the administrative resources of the judicial branch may result. But to date, that concern is entirely speculative, as no such barrage of requests has occurred. The statutory requirements for seeking a subpoena under § 512(h) serve, to some extent, to curtail the threat. Morever, Congress could ameliorate any additional burden on the courts by providing additional funding or resources. Verizon's challenge based on limited resources of the judiciary therefore cannot carry the day at this time.

In sum, § 512(h) does not place the Article III branch in a role inconsistent with that accorded to it under the Constitution. To the extent that the power of the judiciary is even implicated by the issuance of a subpoena under § 512(h), which assigns only a ministerial function to the clerk of the court, there are abundant analogues both in the criminal and civil contexts for judicial action in the absence of a pending federal case or controversy, including the close parallel of Rule 27.[12] And whatever authority is granted under § 512(h) presents neither a danger of encroachment nor some other threat to the institutional integrity and independence of the judiciary. Accordingly, and in light of the reluctance of the federal courts to declare an Act of Congress unconstitutional, *see Mistretta,* 488 U.S. at 384, 109 S.Ct. 647,[13] and the

12. Because the Court concludes that § 512(h) is constitutional on the grounds that it involves only a ministerial function by judicial personnel and is consonant with the role that federal courts have long played in other settings, the Court need not reach an alternate argument advanced by RIAA and the United States—that a case or controversy sufficient to provide a jurisdictional basis for the issuance of a subpoena inheres in the dispute between the copyright holder and the service provider over disclosing the alleged infringer's name. The Court notes, however, that when requesting a subpoena from the clerk of the court, a copyright holder need not assert that a disagreement over whether to provide the alleged infringer's name has emerged or will emerge. *See* 17 U.S.C. § 512(h)(1), (2). Indeed, the § 512(h) subpoena may constitute the copyright holder's first request for the alleged infringer's name, and conceivably the service provider will have no objections to disclosing the name (although, in this particular case, RIAA did make a pre-subpoena request for the name and Verizon did object). Thus, at the time of issuance, a § 512(h) subpoena will not necessarily be tethered to a present or even anticipated "adversary proceeding, involving a real, not a hypothetical, controversy" over providing the name. *Nashville, Chattanooga & St. Louis Ry. v. Wallace,* 288 U.S. 249, 259, 53 S.Ct. 345, 77 L.Ed. 730 (1933). Section § 512(h) is therefore not, as RIAA and the United States contend, analogous to 29 U.S.C. § 1132(c)(1), which allows an ERISA beneficiary to bring a civil action against a plan administrator for information only after the administrator has failed or refused to comply with a request for the information.

13. Verizon cites Justice Scalia's dissenting opinion.in *Morrison* for the proposition that deference is not owed to Congress in assessing the constitutionality of a statute where separation of powers issues are at stake. But one of the factors motivating Justice Scalia's conclusion that deference was unwarranted in *Morrison* was the fact that, in that case, the "political branches [were] ... in disagreement" as to the constitutionality of the statute at issue, and thus neither branch could "be presumed correct." *Morrison,* 487 U.S. at

substantial deference owed to Congress on copyright matters, *see Eldred v. Ashcroft,* —— U.S. ——, 123 S.Ct. 769, 785, 788, 790, 154 L.Ed.2d 683 (2003), Verizon's contention that § 512(h) is unconstitutional must fail.

## III. SECTION 512(h) DOES NOT VIOLATE THE FIRST AMENDMENT

Verizon also contends that the subpoena authority in 512(h) violates the First Amendment rights of Internet users—by piercing their anonymity—both because it does not provide sufficient procedural protection for expressive and associational rights and because it is overbroad and sweeps in protected expression. Although these are certainly important considerations, the Court concludes that § 512(h) does not offend the First Amendment.

### A. Verizon Has Standing to Assert the First Amendment Rights of its Subscribers

■ A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights and interests of third parties.'" *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).[14] This rule prevents "premature interpretations of statutes in areas where their constitu-

tional application might be cloudy" and "assures the court that the issues before it will be concrete and sharply presented." *Sec'y of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). The Supreme Court "has altered its traditional rules of standing to permit—in the First Amendment area—'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)). As the Supreme Court stated in *Broadrick:*

> Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

*Id.; accord Joseph H. Munson Co.,* 467 U.S. at 956, 104 S.Ct. 2839 (party may assert First Amendment overbreadth challenge "of another without regard to the ability of the other to assert his own

---

705, 108 S.Ct. 2597 (Scalia, J., dissenting). Here, of course, the Executive Branch has now intervened in this case to defend the constitutionality of the statute, and hence the political branches are in full accord. Moreover, in *Mistretta,* which followed *Morrison* and involved separation of powers issues concerning the independence and integrity of the judiciary, the Supreme Court stated unequivocally: "'When this Court is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons.'" 488 U.S. at 384, 109 S.Ct. 647 (quoting *Bowsher v. Synar,* 478 U.S. 714, 736, 106

S.Ct. 3181, 92 L.Ed.2d 583 (1986) (opinion concurring in judgment)).

**14.** Although RIAA does not directly challenge Verizon's standing to assert the First Amendment rights of its subscribers, the Court nonetheless must determine whether Verizon has standing to bring these claims. "The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

claim"). Thus, even though Verizon's two subscribers here could arguably assert their own rights,[15] Verizon nonetheless may assert a First Amendment challenge on their behalf.

■ Although Verizon's First Amendment rights are not directly implicated by RIAA's subpoenas, "[f]acial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Joseph H. Munson Co.,* 467 U.S. at 958, 104 S.Ct. 2839.

Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

*Id.* at 956, 104 S.Ct. 2839. A plaintiff's "ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake." *Id.* at 958, 104 S.Ct. 2839.

Verizon is, moreover, an adequate advocate to assert the First Amendment rights of its subscribers. The relationship between an Internet service provider and its subscribers is the type of relationship courts have found will ensure that issues will be "concrete and sharply presented." Verizon has a vested interest in vigorously

protecting its subscribers' First Amendment rights, because a failure to do so could affect Verizon's ability to maintain and broaden its client base. The Supreme Court has recognized third-party standing in similar business/client relationships. *See Virginia v. American Booksellers Assoc.,* 484 U.S. 383, 392–93, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (bookstores may raise First Amendment rights on behalf of booksellers); *Joseph H. Munson Co.,* 467 U.S. at 958, 104 S.Ct. 2839 (professional fundraiser may assert First Amendment rights of its client charities); *Dep't of Labor v. Triplett,* 494 U.S. 715, 720, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990) ("A restriction upon the fees a lawyer may charge that deprives the lawyer's prospective client of a due process right to obtain legal representation falls squarely within this principle."); *Craig v. Boren,* 429 U.S. 190, 194–97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (beer vendor may assert equal protection claims of males not allowed to purchase beer until they turn 21); *see also Broadrick,* 413 U.S. at 612, 93 S.Ct. 2908 ("Overbreadth attacks [raised by third-parties] have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations."). Verizon's relationship with its client subscribers is the kind of relationship that warrants allowing Verizon to assert a First Amendment challenge on their behalf.[16]

**B. The First Amendment Protects Anonymous Expression on the Internet**

■ The Supreme Court has recognized a right of anonymity within the First

---

**15.** The alleged infringers could assert their own First Amendment rights, while still protecting their anonymity, as "John Doe" litigants. Verizon has now notified both subscribers of RIAA's subpoenas and allegations of copyright infringement.

**16.** The Court is also aided in this case by the submissions of *amici* representing the interests of Internet users.

Amendment. *Buckley v. American Constitutional Law Found.*, 525 U.S. 182, 200, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (invalidating, on First Amendment grounds, a Colorado statute that required initiative petitioners to wear identification badges); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (overturning Ohio law that prohibited distribution of campaign literature without name and address of the person issuing the literature; "anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent"); *Talley v. California*, 362 U.S. 60, 65, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (invalidating California statute prohibiting distribution of handbills without name and address of preparer).[17] Courts have also recognized that the protections of the First Amendment reach expression on the Internet. *See, e.g., Reno v. ACLU*, 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates further than it could from any soapbox."); *2TheMart.Com*, 140 F.Supp.2d at 1092 ("First Amendment protections extend to speech via the Internet.").

An individual's anonymity may be important for encouraging the type of expression protected by the First Amendment. "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possi-

ble." *McIntyre*, 514 U.S. at 341–42, 115 S.Ct. 1511. Indeed, "quite apart from any threat of persecution, an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity." *Id.* at 342, 115 S.Ct. 1511. As stated in *Talley*, "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind." 362 U.S. at 64, 80 S.Ct. 536. Hence, several lower court cases have found that First Amendments rights, particularly the right to anonymity, extend to expression on the Internet. *See, e.g., 2TheMart.Com*, 140 F.Supp.2d at 1097 ("the constitutional rights of Internet users, including the right to speak anonymously, must be carefully safeguarded"); *ACLU v. Johnson*, 4 F.Supp.2d 1029, 1033 (D.N.M.1998) (striking law "that prevents people from communicating and accessing information anonymously"); *Columbia Ins. Co. v. Seescandy.Com*, 185 F.R.D. 573, 578 (N.D.Cal.1999) (recognizing "legitimate and valuable right to participate in online forums anonymously or pseudonymously").

But when the Supreme Court has held that the First Amendment protects anonymity, it has typically done so in cases involving core First Amendment expression. *See, e.g., Watchtower Bible, Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 153, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002) (striking down ordinance requiring permit for door-to-door advocacy "not only as it applies to religious proselytizing, but also to anonymous political speech and the distribution of hand-

---

**17.** Courts have acknowledged some limitations on the subpoena power when its invocation affects First Amendment rights involving anonymity. *See, e.g., NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (discussing First Amendment implications of civil subpoena to disclose membership list); *Doe v. 2TheMart.Com Inc.*, 140 F.Supp.2d 1088, 1091

(W.D.Wash.2001) (addressing First Amendment rights when corporation served subpoena on ISP to obtain identity of anonymous shareholders in derivative action); *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 489 (C.D.Cal.1981) (discussing First Amendment implications of civil subpoena to disclose names of confidential journalistic sources).

bills"); *Buckley,* 525 U.S. at 199, 119 S.Ct. 636 (striking down petition circulation rule requiring petitioners to be registered voters because "that endeavor . . . of necessity involves . . . the expression of a desire for political change"); *McIntyre,* 514 U.S. at 346, 115 S.Ct. 1511 ("the speech in which Mrs. McIntyre engaged—handing out leaflets in the advocacy of a politically controversial viewpoint—is the essence of First Amendment expression"). As the Supreme Court has explained, "[t]he First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " *Id.* at 346, 115 S.Ct. 1511 (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). "When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *Id.* at 347, 115 S.Ct. 1511.

The DMCA, however, does not directly impact core political speech, and thus may not warrant the type of "exacting scrutiny" reserved for that context. Section 512(h) deals strictly with copyright infringement. Verizon concedes, as it must, that there is no First Amendment defense to copyright violations. The "Supreme Court . . . has made it unmistakably clear that the First Amendment does not shield copyright infringement." *Universal City Studios, Inc. v. Reimerdes,* 82 F.Supp.2d 211, 220 (S.D.N.Y.2000); *see Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 568, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (rejecting First Amendment challenge to copyright infringement action); *Zacchini v. Scripps–Howard,* 433 U.S. 562, 574–78, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). In other words, "the First Amendment is not a license to trammel on legally recognized rights in intellectual property." *In re Capital Cities/ABC, Inc.,* 918 F.2d 140, 143 (11th Cir.1990) (quotations omitted). Indeed, copyrights serve as important incentives to encourage and protect expression: "the Framers intended copyright itself to be the engine of free expression." *Eldred,* 123 S.Ct. at 788 (quoting *Harper & Row,* 471 U.S. at 558, 105 S.Ct. 2218). "By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Id.* Nonetheless, the Court concludes for present purposes that there is some level of First Amendment protection that should be afforded to anonymous expression on the Internet, even though the degree of protection is minimal where alleged copyright infringement is the expression at issue.

### C. § 512(h) Provides Sufficient Safeguards to Protect Internet Users' Rights

■ Verizon maintains that the DMCA does not provide adequate safeguards to protect Internet users' rights of expression and association. In this regard, Verizon relies heavily on the Supreme Court's decision in *Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971), which overturned a federal statute authorizing prior restraint and censorship of obscene materials sent through the mail. The Court in *Blount* held that "the line between speech unconditionally guaranteed and speech which may legitimately be regulated . . . is finely drawn," and thus "[t]he separation of legitimate from illegitimate speech calls for sensitive tools." *Id.* at 417, 91 S.Ct. 423 (quoting *Speiser v. Randall,* 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)). The strictures in *Blount* and its progeny, however, do not apply outside the obscenity realm; moreover, even if they did, the DMCA contains

adequate safeguards to ensure that the First Amendment rights of Internet users will not be curtailed.

*Blount* struck down a statute that authorized the Postmaster General to halt the use of the mails for commerce in allegedly obscene materials and permitted detention of mail pending resolution of an obscenity determination.

> Since § 4006 on its face, and § 4007 as applied, are procedures designed to deny use of the mails to commercial distributors of obscene literature, those procedures violate the First Amendment unless they include built-in safeguards against curtailment of constitutionally protected expression, for Government is not free to adopt whatever procedures it pleases for dealing with obscenity … without regard to the possible consequences for constitutionally protected speech. Rather, the First Amendment requires that procedures be incorporated that ensure against the curtailment of constitutionally protected expression, which is often separate from obscenity only by a dim and uncertain line.

400 U.S. at 416, 91 S.Ct. 423 (citations omitted). Because the government was censoring speech and regulating obscenity, the Court "insist[ed] that regulations of obscenity scrupulously embody the most rigorous procedural safeguards." *Id.* "[T]he fatal flaw of the [statute's] procedure," the Court explained, was that it "fail[ed] to require that the Postmaster General seek to obtain a prompt judicial determination of the obscenity of the material." *Id.* at 418, 91 S.Ct. 423.

The Supreme Court's decision in *Blount* cannot be read as broadly as Verizon would like. The statute challenged in *Blount* authorized government censorship and prior restraint of allegedly obscene material sent through the mail, without any judicial determination of obscenity.

In such circumstances, the Court emphasized, "the censor's business is to censor." *Id.* at 419, 91 S.Ct. 423. "The teaching of our cases is that, because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint.'" *Id.* (quoting *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)). The Court emphasized that "it is vital that prompt judicial review on the issue of obscenity—rather than merely probable cause—be assured on the Government's initiative before the severe restrictions in [the statute] are invoked." *Id.* at 420, 91 S.Ct. 423.

Unlike the statute in *Blount,* however, the DMCA neither authorizes governmental censorship nor involves prior restraint of potentially protected expression. Section 512(h) merely allows a private copyright owner to obtain the identity of an alleged copyright infringer in order to protect constitutionally-recognized rights in creative works; it does not even directly seek or restrain the underlying expression (the sharing of copyrighted material). Thus, the DMCA does not regulate protected expression or otherwise permit prior restraint of protected speech. It only requires production of the identity of one who has engaged in unprotected conducts-haring copyrighted material on the Internet. The statute in *Blount,* in contrast, authorized both prior restraint and censorship by the government—a far more "severe restriction" on First Amendment rights. Content-based prior restraint of expressive activity, the Supreme Court has held, warrants the strictest scrutiny known to First Amendment jurisprudence. *See New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam) (" 'Any system of

prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' ") (quoting *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)). The DMCA places no limits on protected activity; it governs unprotected copyright piracy, and § 512(h) reaches only the identity of the subscriber (already known to the service provider), not any underlying expression. Moreover, the content of § 512(h) is not obscenity but copyright legislation, where "[t]he wisdom of Congress' action ... is not within [the Court's] province to second guess." *Eldred,* 123 S.Ct. at 790.

The Supreme Court has not extended *Blount's* requirements of "built-in safeguards" and judicial review beyond the obscenity context,[18] and lower federal courts have declined to apply *Blount* and its progeny in other contexts.[19] Because the DMCA does not address obscenity and does not censor or otherwise authorize pri-

or restraint of expression, the Court finds Verizon's reliance on *Blount* is misplaced.

Even if such safeguards were required, however, the DMCA includes sufficient procedures to prevent any substantial encroachment on the First Amendment rights of Internet users. Before a copyright owner (or its agent) can obtain a § 512(h) subpoena, for example, one must have a "good faith belief" that the use of copyrighted material is not authorized by the owner. 17 U.S.C. § 512(c)(3)(A)(v). Moreover, the DMCA requires a copyright owner to submit

> a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title.

*Id.* § 512(h)(2)(c). The DMCA also requires a person seeking a subpoena to state, under penalty of perjury, that he is authorized to act on behalf of the copyright owner. *Id.* § 512(c)(3)(A)(vi). These

---

**18.** The application of *Blount* has been limited to obscenity settings. *See, e.g., FW/PBS v. City of Dallas,* 493 U.S. 215, 239, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (licensing ordinance for adult entertainment industry); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 561, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (sex and nudity in play); *Paris Adult Theatre v. Slaton,* 413 U.S. 49, 55, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (Georgia obscenity law relating to films in theaters); *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 368, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) (forfeiture of obscene photographs found in luggage); *United States v. Reidel,* 402 U.S. 351, 359, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971) ("if government chooses a system of prior restraints as an aid to its goal of proscribing obscenity, the system must be designed to minimize impact on speech which is constitutionally protected") (Marshall, J., concurring). In a First Amendment challenge involving a labor context, the Supreme Court—citing *Blount*—explained that "[i]n other First Amendment contexts, of course, we have re-

quired swift judicial review of the challenged governmental action. In this context, we do not believe that such special judicial procedures are necessary." *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 307 n. 20, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986).

**19.** *See, e.g., Cannabis Action Network, Inc. v. City of Gainesville,* 231 F.3d 761, 775 (11th Cir.2000) (*Blount* line of cases "predominantly involved censorship" of obscene materials); *O'Connor v. City and County of Denver,* 894 F.2d 1210, 1223 (10th Cir.1990) ("The *Freedman* requirements [adopted by the Court in *Blount* ] are limited to prior restraints on protected expression."); *United States v. Outpost Development Corp.,* 369 F.Supp. 399, 402 (C.D.Cal.1973) ("[w]e read *Blount* as being applicable to questions involving alleged obscenity, but not to alleged fraudulent schemes"); *Lynch v. Blount,* 330 F.Supp. 689, 694 (S.D.N.Y.1971) ("We think the safeguards defined in *Blount* for obscenity cases are wholly inappropriate, unnecessary and inapplicable to the field of commercial fraud.").

provisions provide substantial protection for Internet users against baseless or abusive subpoenas.[20] In fact, the statute contains an important disincentive for false representations, thereby further protecting against abusive or harassing subpoenas. *See id.* § 512(f) (any person who "knowingly materially misrepresents" that activity is infringing "shall be liable for damages, including costs and attorneys' fees, incurred by the alleged infringer" as a result of the misrepresentation). With all these protections, it is unlikely that § 512(h) will require disclosure, to any significant degree, of the identity of individuals engaged in protected anonymous speech, as opposed to those engaged in unprotected copyright infringement.

Verizon asserts that, under the DMCA, a copyright owner does not have to demonstrate that the allegation of copyright infringement could withstand a motion to dismiss. However, in order to obtain a subpoena, the copyright owner must, in effect, plead a prima facie case of copyright infringement. *See Feist Publ'ns, Inc. v. Rural Tel. Svc. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (the elements of a prima facie case of copyright infringement are "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original"); *accord, Lulirama, Ltd. v. Axcess Broadcast Svcs.,* 128 F.3d 872, 884 (5th Cir.1997). Under § 512, one must assert ownership of an exclusive copyright, § 512(c)(3)(A)(i), and a good faith belief that the use of copyrighted material is not authorized, § 512(c)(3)(A)(v). In other words, the subpoena notification must establish ownership and unauthorized use—a prima facie case of copyright infringement.[21]

Lastly, the DMCA provides that the Federal Rules of Civil Procedure govern the issuance, service, enforcement, and compliance of subpoenas. 17 U.S.C. § 512(h)(6). Hence, access to the courts and the judicial supervision Verizon urges to protect Internet users is available. Service providers or their subscribers, for example, can employ Fed.R.Civ.P. 45 to object to, modify or move to quash a subpoena, or even to seek sanctions. *See, e.g.,* Fed.R.Civ.P. 45(c)(1) (authorizing sanctions for overbroad, burdensome, or vexatious subpoenas). This adds yet another layer of protection for Internet users.[22] Thus, in sum, the Court rejects

---

**20.** Congress specifically enacted these procedural requirements to prevent mistakes and abuse. *See* S.Rep. No. 105–190, at 9 (explaining that the DMCA contains "important procedural protections for individual Internet users to ensure that they will not be mistakenly denied access to the World Wide Web").

**21.** Although the standard for obtaining a § 512(h) subpoena differs somewhat from the standard for obtaining a subpoena through the more traditional procedure governed by Fed.R.Civ.P. 11, the difference is not substantial. Under § 512(c)(3)(A)(v), a copyright owner must have a "good faith belief" that the use of the copyrighted material is not authorized. Under Rule 11, a party or attorney can be sanctioned absent an "objective" basis that the claim was sound. *See Tahfs v. Proctor,* 316 F.3d 584, 594 (6th Cir.2003) (re-

quiring objective basis for claims under Rule 11); *Byrne v. Nezhat,* 261 F.3d 1075, 1105–06 (11th Cir.2001) (same). Both procedures allow for sanctions for any baseless or meritless claims.

**22.** These provisions under § 512 are precisely the type of procedural requirements other courts have imposed—in non-copyright cases—to compel a service provider to reveal the identity of anonymous Internet users. *See Columbia Ins. Co. v. Seescandy.Com,* 185 F.R.D. 573, 578–80 (N.D.Cal.1999) (in trademark dispute against anonymous person, court required plaintiff to identify person with specificity, identify all steps taken to locate elusive person, establish that suit could withstand motion to dismiss, and show "probable cause [as] a protection against the misuse of *ex parte* procedures to invade the privacy of

Verizon's contention that § 512 does not provide sufficient safeguards or judicial supervision to protect Internet users' First Amendment rights, including anonymity.

### D. Section 512(h) Is Not Overbroad

■ Verizon claims that the § 512(h) subpoena authority is substantially overbroad and will chill protected anonymous speech and association. As explained earlier, the overbreadth doctrine permits facial challenges to statutes on the ground that the statute or regulation reaches constitutionally protected speech of parties not before the court. *Broadrick*, 413 U.S. at 612–15, 93 S.Ct. 2908. If a statute is substantially overbroad, and thus sweeps within its proscriptions a good amount of protected expression, the statute is unconstitutional. The doctrine is predicated on "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 612, 93 S.Ct. 2908.

■ The scope of § 512(h) may impact some protected expression and association, in that the threat of a subpoena under the DMCA, and the resulting disclosure of identity, could discourage some Internet users from otherwise protected activity.

It is also possible that a copyright owner could mistakenly pursue, and obtain, the identity of an anonymous Internet user who was not, in actuality, infringing copyrighted materials. Yet, "[t]o prevail in a facial challenge, however, it is not enough for a plaintiff to show 'some' overbreadth. Rather, the overbreadth of a statute must not only be real, but substantial as well." *Ashcroft v. ACLU*, 535 U.S. 564, 584, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (citations omitted); *Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) ("Only a statute that is substantially overbroad may be invalidated on its face."). The § 512(h) subpoena authority hardly amounts to a real or substantial threat to protected expression. Indeed, Verizon has not come forward with any evidence that in the five years since the DMCA was enacted, § 512(h) subpoenas have been used to identify anyone but Internet users engaging in copyright infringement.[23]

Verizon also portends that § 512(h) could be used by "cyberstalkers" to issue fraudulent subpoenas to obtain identifying information (such as phone numbers and addresses) about people they meet in Internet chat rooms. Of course, this anonymity issue, although perhaps somewhat

---

one who has done no wrong"); *Doe v. 2TheMart.Com, Inc.*, 140 F.Supp.2d. at 1095 (to obtain subpoena to identify anonymous poster of criticism of corporation, party must show it was acting in good faith and not for an improper purpose, that information directly related to core claim, and that information was unavailable from any other source); *In re Subpoena Duces Tecum to America Online, Inc.*, 2000 WL 1210372, * 8 (Va. Cir. Ct. Jan.31, 2000) (to obtain identity of anonymous Internet users, court required that "the party requesting the subpoena has a legitimate, good faith basis to contend that it may be the victim of conduct actionable" and that information sought "is centrally needed to advance that claim").

**23.** Verizon highlights an incident involving a notice to an Internet service provider alleging possible copyright infringement of a Harry Potter film. The allegedly infringing work turned out to be a child's book report, which the "robotic" software could not distinguish from the copyrighted work. However, the copyright owner did not issue a § 512(h) subpoena, but merely notified the service provider by letter of the alleged infringement. Such mistakes are possible using evolving technology, but there is nothing to suggest they will cause substantial chilling of expression on the Internet.

related to a First Amendment expressive interest, is generated more by safety concerns. As such, it may be more properly considered as a policy argument against broad subpoena authority, and therefore a matter for Congress rather than this Court. But in any event, requirements in the DMCA should prevent such speculation from ever becoming a reality. In order to get a subpoena, one must identify the material claimed to be infringing, and information reasonably sufficient to permit the service provider to locate the material. *See* § 512(c)(3)(A)(iii). Likewise, § 512(c)(3)(A)(ii) requires identification of the online site where the copyrighted works are claimed to be infringed. Although conceivably one could falsify such information in a subpoena, the information is also easily verifiable by service providers, who can provide an additional check against fraudulent conduct. In fact, the remedial provisions of the DMCA, including the right to damages for misrepresentation, attorneys fees, contempt sanctions and even the possibility of criminal perjury charges, should deter potential stalkers.

The risk of cyberstalking and any accompanying impact on expressive interests, then, is minimal. As the Supreme Court has explained, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Taxpayers for Vincent,* 466 U.S. at 800, 104 S.Ct. 2118. "Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face." *Ferber,* 458 U.S. at 770, 102 S.Ct. 3348. Again, it is noteworthy that although it has been nearly five years since § 512 came into effect, there is nothing in the record to indicate that the DMCA subpoena authority has been used

for stalking or other fraudulent purposes. Hence, while conceivable, Verizon's cyberstalking scenario is unlikely, and the DMCA cannot be found unconstitutionally overbroad on such a thin reed of speculation. *See Taxpayers for Vincent,* 466 U.S. at 800 n. 19, 104 S.Ct. 2118 ("We have never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application, and in that sense a requirement of substantial overbreadth is already implicit in the doctrine.") (quoting *Broadrick,* 413 U.S. at 630, 93 S.Ct. 2908 (Brennan, J., dissenting)); *Ferber,* 458 U.S. at 771, 102 S.Ct. 3348 ("[A] law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications.").

The Supreme Court has emphasized repeatedly that "where a statute regulates expressive conduct, the scope of the statute does not render it unconstitutional unless its overbreadth is not only real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Osborne v. Ohio,* 495 U.S. 103, 112, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). Any overbreadth resulting from § 512(h) that arguably chills First Amendment expression or association is neither "real" nor "substantial" in relation to the DMCA's "plainly legitimate sweep" of identifying copyright infringers. The extent of copyright infringement and piracy of intellectual property over the Internet, on the other hand, is well-recognized and "has reached epidemic proportions." *United States v. Elcom, Ltd.,* 203 F.Supp.2d 1111, 1132 (N.D.Cal.2002). The recording industry has suffered substantial losses due to Internet piracy Whatever marginal impact the DMCA subpoena authority may have on the expressive or anonymity rights of Internet users, then, is vastly outweighed by the extent of copyright infringement

over the Internet through peer-to-peer file sharing, which is the context of the legitimate sweep of § 512(h).

The DMCA does not regulate expression, and § 512(h) is not directed at the suppression of expression. Indeed, Congress enacted the DMCA in part to *spur* and *promote* expression, not suppress it. Congress was concerned that "copyright owners [would] hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy." S.Rep. No. 105–190, at 8 (1998). The ability to copyright, in fact, is "the engine of free expression." *Eldred,* 123 S.Ct. at 788 (quoting *Harper & Row,* 471 U.S. at 558, 105 S.Ct. 2218). Hence, the DMCA *fosters* speech by helping artists, musicians, and authors protect their creative works, in turn encouraging further expression.

The Supreme Court has cautioned that application of the overbreadth doctrine "is, manifestly, strong medicine." *Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908. The doctrine is therefore employed "with hesitation, and then 'only as a last resort.'" *Ferber,* 458 U.S. at 769, 102 S.Ct. 3348 (quoting *Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908). "[T]here must be a *realistic danger* that the statute itself will *significantly compromise* recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Taxpayers for Vincent,* 466 U.S. at 801, 104 S.Ct. 2118 (emphasis added). Verizon simply has not shown that the subpoena authority under § 512(h) is so overbroad that it sweeps a substantial amount of protected expression within the DMCA's proscriptions. Verizon's bald speculation of mistakes, abuse or harassment that has yet to occur to any degree (let alone to any substantial degree) since the statute was enacted is simply not enough. "[J]udged in relation to the statute's plainly legitimate sweep," and in light of the extent of copyright piracy over the Internet, any impact on expressive and associational rights on the Internet is negligible.

■ Ultimately, Verizon suggests that even if § 512(h) is not found facially unconstitutional, it should nonetheless be construed narrowly so as to avoid serious First Amendment issues. "When the validity of an act of Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Public Citizen v. Dep't of Justice,* 491 U.S. 440, 465–66, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (citation omitted). Hence, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.* at 466, 109 S.Ct. 2558.

To begin with, this Court has already determined in its *First Subpoena Decision* that the construction of § 512(h) Verizon proposes is not plausible given the statutory language, context, purpose and legislative history, and thus would be "plainly contrary to the intent of Congress." Moreover, before this constitutional avoidance doctrine can be applied, a Court must first be faced with a "grave" constitutional question, *AAPS v. Clinton,* 997 F.2d 898, 906 (D.C.Cir.1993), or a "formidable constitutional difficult[y]," *Public Citizen,* 491 U.S. at 466, 109 S.Ct. 2558. Here, § 512(h) does not present a grave or formidable constitutional problem. As explained above, the Court rejects Verizon's

First Amendment challenge to § 512(h).[24] "[T]he Court need not apply ... the doctrine ... where a constitutional question, while lacking an obvious answer, does not lead a majority gravely to doubt that the statute is constitutional." *Almendarez–Torres v. United States,* 523 U.S. 224, 239, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).

Even if the Court were presented with such grave doubts, moreover, Verizon's proposed construction of the statute would not eliminate the constitutional problem, but rather would only reduce it. The Court has construed § 512(h) as applying to all service providers under the DMCA, including those falling within the conduit functions under subsection (a). Verizon would construe § 512(h)'s subpoena power to apply only to subsection (c), where the subscriber stores his allegedly infringing material on the service provider's system. But Internet users who fall within subsection (c) have anonymity interests identical to users within subsection (a), and hence would be susceptible to the same chilling of expressive and associational rights asserted by Verizon. Thus, Verizon's construction would only mean that fewer users would have their First Amendment interests impacted—the same alleged constitutional problem would persist to some degree.

"The principle ... is a categorical one: as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." *Rust v. Sullivan,* 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233(1991) (quoting *Blodgett v. Holden,* 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927)). But reading § 512(h) as applying only to sub-section (c) users does not eliminate Verizon's alleged constitutional problem—it only reduces it—and thus will not "save" the DMCA. If the subpoena authority under § 512(h) chills expression and association, it does so as applied to both subsection (c) users and subsection (a) users. Hence, not only is the narrow construction urged by Verizon not a plausible one to which § 512(h) is "genuinely susceptible," as this Court has previously found, *see First Subpoena Decision,* 240 F.Supp.2d at 30–39, but it would not save § 512(h) from the alleged constitutional infirmity in any event.

In the end, Verizon's customers should have little expectation of privacy (or anonymity) in infringing copyrights. Subscribers to Verizon's Internet services are put on clear notice that they cannot use Verizon's service or network to infringe copyrights. *See* Verizon Online Terms of Service, *http://www.verizon.net/policies/popups/internetaa popup.asp.* In fact, as part of its corporate policy, Verizon alerts its subscribers at the outset that it will "disclose individual customer information to an outside entity ... when Verizon is served with valid legal process for customer information." *See* Verizon Privacy Principles, *http://www22.verizon.com/About/Privacy/genpriv.* And if an individual subscriber opens his computer to permit others, through peer-to-peer filesharing, to download materials from that computer, it is hard to understand just what privacy expectation he or she has after essentially opening the computer to the world. *See United States v. Kennedy,* 81 F.Supp.2d 1103, 1110 (D.Kan.2000) (no expectation of privacy where user has

---

**24.** Constitutional avoidance does not apply to Verizon's Article III challenge, as no limiting construction of § 512(h) would cure that alleged constitutional defect—the alleged "case or controversy" deficiency pertains to *any* subpoena, whether addressed to a subsection (a) or subsection (c) service provider.

opened files up on home computer to anyone who wants to receive them).

## IV. VERIZON'S STAY REQUEST

Verizon emphasizes that both subpoena actions are test cases raising issues of first impression, and urges the Court to stay its rulings on both matters pending appeal. Although the Court does not dispute Verizon's characterization of these subpoena cases, novelty of issues alone does not entitle a litigant to a stay pending appeal. Applying the well-established standards in this Circuit, Verizon's request for a stay pending appeal must be denied.

### A. Standard for a Stay

 To obtain a stay pending appeal, Verizon "must show (1) that it has a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury if the stay is denied; (3) that issuance of the stay will not cause substantial harm to other parties; and (4) that the public interest will be served by issuance of the stay." *United States v. Philip Morris Inc.*, 314 F.3d 612, 617 (D.C.Cir.2003) (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours. Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977)). "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C.Cir.1998); *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995) ("If the arguments for one factor are particularly strong, [a stay] may issue even if the arguments in other areas are rather weak."). On a motion for stay, "it is the movant's obligation to justify the court's exercise of such an extraordinary

remedy." *Cuomo v. U.S. Nuclear Reg. Comm'n*, 772 F.2d 972, 978 (D.C.Cir. 1985).[25] Although there may be a temptation to conclude that a stay is warranted in this "test" case to enable the Court of Appeals to consider issues arguably of first impression, Verizon in fact has a heavy burden to justify an entitlement to this "extraordinary remedy."

### B. Likelihood of Success on the Merits

 Verizon's likelihood of success on the merits of its claims, both statutory and constitutional, is minimal. In the *First Subpoena Decision,* the Court concluded "that the subpoena power in 17 U.S.C. § 512(h) applies to all Internet service providers within the scope of the DMCA, not just those service providers storing information on a system or network at the direction of a user." 240 F.Supp.2d at 26. Verizon argues that the Court's central reliance on the definition of the term "service provider" is "misplaced." However, the Court followed well-accepted canons of statutory construction in applying § 512(k)'s broad definition of "service provider" to the subpoena authority under § 512(h). First and foremost, the plain language of the statute's definition provision in subsection (k) mandates this result. It is only by dismissing the subsection (k) definition of "service provider" altogether that Verizon can contend otherwise. But there is no basis for ignoring that clear, governing definitional language. Where a statute "unambiguously uses a statutorily defined term, that definition controls." *Wolverine Power Co. v. FERC*, 963 F.2d

---

**25.** Although presenting a serious legal issue on appeal may weigh in favor of a stay, the movant still must demonstrate that the balance of harms strongly favors such relief. *See Nat'l Ass'n of Farmworkers v. Marshall,* 628 F.2d 604, 616 (D.C.Cir.1980); *Holiday Tours,*

559 F.2d at 844. Hence, a stay will not be granted in a subpoena enforcement action simply because a novel legal issue is presented. *See FEC v. Comm'n to Elect Lyndon LaRouche,* 613 F.2d 849, 853 (D.C.Cir.1979).

446, 451 (D.C.Cir.1992). Moreover, the structure, purpose and legislative history of the DMCA fully support the conclusion that the § 512(h) subpoena authority extends to all service providers, including those (like Verizon) who fall within subsection (a)'s conduit functions. The statutory construction issue Verizon presents may be important and even novel, but that does not necessarily mean it is close or that Verizon is likely to succeed on the merits of its appeal.

Verizon contends that the Court's construction of the DMCA renders the "take down" notification within § 512(c)(3)(A)(ii) meaningless, because "material" can only be "removed" by a service provider if it is physically stored on the provider's network or system. Under subsection (a), the copyrighted material is stored on the user's own computer, and therefore a service provider cannot remove that material. Verizon therefore argues that the § 512(h) subpoena authority can only apply to subsection (c) service providers because they store such materials on their systems. However, § 512(h) requires a copyright owner to provide the clerk with a "copy of the notification *described* in subsection (c)(3)(A)." § 512(h)(2)(A) (emphasis added). It does not require a service provider to actually "take down," or disable access to, the material alleged to be infringing. Verizon confuses the obligation of the copyright owner simply to provide a "copy" of the notification "described" in subsection (c)(3)(A) with a duty actually to "take down" the material—a duty not found in or required by subsection (h). Moreover, even if one accepted Verizon's interpretation of the statute, a service provider within subsection (a) still could satisfy subsection (c)(3)(A)(iii)'s requirement to identify

the material that is to be removed or to which access is to be disabled. Again, this is only an obligation to identify the alleged infringing material, not a requirement to remove or disable access to it. Finally, even if there were such a requirement, a service provider can "disable access" to the material by terminating the subscriber's account.

An additional statutory argument raised by Verizon to justify a stay rests on § 512(n), which provides:

> Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section. Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.

17 U.S.C. § 512(n). Verizon argues that the scope of the subpoena authority should be determined in light of the service provider's *function*, rather than in accordance with the definition of "service provider" in subsection (k)(1), as this Court concluded. This argument was not initially raised in the first subpoena action, but only in Verizon's stay motion—and for good reason. Subsection (n) explicitly applies only to whether a service provider qualifies for the "limitation on liability" in subsections (a) through (d), and makes no reference whatsoever to construction of the subpoena authority under subsection (h). Thus, subsection (n) cannot be read to somehow narrow the broad definition of "service provider" set out in subsection (k).[26] That

---

26. As the Court explained in its prior decision, there is no doubt that subsection (k)'s broad definition of "service provider" applies to subsection (a) conduit functions such as

providing Internet connectivity or e-mail. *See* 240 F.3d at 31. The legislative history of the DMCA makes this explicit, noting that the definition of "service provider" under subsec-

definition is governing here, and nothing in subsection (n) is inconsistent with that conclusion.

Nor is there a substantial likelihood that Verizon will prevail on the merits of its Article III challenge to § 512(h). To be sure, the clerk of the court is not commonly called upon to issue a subpoena in the absence of a pending case or controversy. But given that the clerk only, not a federal judge, is actually involved in the issuance of a § 512(h) subpoena, and that, in any event, there is ample precedent for judicial compulsion of evidence in the absence of a pending federal court case or controversy, it is clear that the procedure authorized by § 512(h) is constitutionally permissible. Verizon thus has no more than a marginal likelihood of success on its Article III challenge.

Verizon is even less likely to prevail on its First Amendment claim. Section 512(h) does not purport to regulate speech or expression; rather, it is a tool to aid copyright owners in identifying infringers and combating Internet piracy. The subpoena provision contains a number of substantial procedural requirements aimed at preventing abuse, fraud, and mistakes, without chilling expressive or associational rights. Moreover, Verizon's overbreadth challenge fails on several grounds, and the constitutional avoidance doctrine is inapposite because a grave constitutional problem is not presented and because Verizon's suggested "saving" construction of § 512(h) is not plausible and, in any event, would only reduce, not eliminate, the alleged constitutional infirmity.

In short, there is little chance that Verizon will succeed on the merits of its statutory and constitutional claims on appeal, and surely not a "probability" or "substan-

tial likelihood" of such success. "[A] court, when confronted with a case in which the other three [stay] factors strongly favor interim relief may exercise its discretion to grant a stay if the movant has made a substantial case on the merits." *Holiday Tours*, 559 F.2d at 843. In that setting, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, and difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Id.* at 844. As explained below, however, here the balance of harms does not favor a stay, and thus it remains "particularly important for the movant to demonstrate a substantial likelihood of success on the merits." *Dodd v. Fleming*, 223 F.Supp.2d 15, 20 (D.D.C. 2002). Verizon has not done so—the statutory and constitutional claims it asserts are ultimately not difficult, and there is accordingly no need for further "deliberative investigation" on them. Verizon's inability to establish a likelihood of success on the merits therefore fatally undermines its stay request.

## C. Balance of Harms

Both Verizon and RIAA claim forcefully that they will be irreparably injured by an adverse stay ruling from the Court. Verizon claims the denial of a stay may moot its appeal and injure its business interests, while RIAA argues that, if a stay is granted, extensive copyright infringement would continue indefinitely. RIAA also fears that other service providers may refuse to comply with DMCA subpoenas until the Court of Appeals rules, thereby delaying RIAA's investigation of copyright infringement on the Internet.

---

tion (k) includes "services such as providing Internet access, e-mail, chat room and web page hosting services"—the very services within subsection (a)'s conduit functions. *See* S.Rep. No. 105–190, at 54; *see also* H.R.Rep. No. 105–551(II), at 64 (1998).

## 1. Injury to Verizon

To begin with, it is difficult to appreciate Verizon's claims of harm to its interests, given that Verizon has stressed throughout this litigation that RIAA could readily obtain the identity of the alleged infringers through a John Doe action. *See* Verizon Opp. to Mot. to Enforce, No. 02–MS–0323 (Aug. 30, 2002), at 5, 24–25; *see generally First Subpoena Decision*, 240 F.Supp.2d at 39–41. In fact, Verizon has indicated that it will cooperate with a subpoena served under a John Doe complaint, and disclose the identity of an alleged infringer. *Id.* at 24–25; Verizon Mot. for Stay, No. 02–MS–0323 (Jan. 30, 2002), at 14. If that is the case, and it is only a question of the process for disclosure of such information, then one cannot easily fathom how Verizon would truly suffer serious, irreparable harm warranting a stay.

Verizon maintains that it will be irreparably harmed by disclosure of a user's identity because that will adversely affect the goodwill Verizon has developed with its subscribers and may scare off future business. "The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Wisconsin Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 674 (D.C.Cir.1985)(emphasis in original; citation omitted). Impact on business and profits "may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Id.; see also Holiday Tours*, 559 F.2d at 843 n. 2. Verizon makes no showing that compliance with this one subpoena, or even with a series of subpoenas for subscribers' identities, pending appellate proceedings would threaten the very existence of its business.

In the end, then, it is difficult to discern any irreparable injury to Verizon from having to disclose, under court order, the identities of a few of its subscribers. Any harm to its goodwill is speculative and negligible. Weighing the stay factors on a sliding scale tips heavily against granting Verizon's request for a stay where it can show only the slightest threat of irreparable injury. "Despite this flexibility, we require the moving party to demonstrate at least 'some injury,' since 'the basis for injunctive relief in the federal courts has always been irreparable harm.'" *CityFed Fin. Corp.*, 58 F.3d at 747 (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C.Cir.1986), and *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). Indeed, because the movant "ha[s] made no showing of irreparable injury here, that alone is sufficient for us to conclude that the district court did not abuse its discretion by rejecting [movant's] request." *CityFed. Fin. Corp.*, 58 F.3d at 747; *see also Dodd v. Fleming*, 223 F.Supp.2d at 20 ("if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors"). Without irreparable injury, Verizon simply cannot justify a stay.

## 2. Mootness

Verizon also contends that it will be irreparably harmed absent a stay because the revelation of its subscriber's identity would moot the appeal and deprive Verizon of its statutory right to further judicial review. *See Center for Int'l Envtl. Law v. Office of U.S. Trade Rep.*, 240 F.Supp.2d 21, 22–23 (D.D.C.2003) ("defendants have made a strong showing of irreparable harm because disclosure of the documents in question will render any appeal moot"); *Center for Nat'l Security Studies v. United States Dep't of Justice*, 217 F.Supp.2d 58, 58 (D.D.C.2002) (granting stay of disclosure order in FOIA case where compli-

ance with order "would effectively moot any appeal"). RIAA counters that effective relief could still be granted and that the case falls within the "capable of repetition yet evading review" exception to mootness. RIAA has stated, moreover, that it will not argue mootness on appeal. Hearing Tr., Mot. to Stay, 02–MS–0323 (Feb. 13, 2003), at 44.[27]

These subpoenas seem to fall within an exception to mootness. The Supreme Court has found "that jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one 'capable of repetition, yet evading review.' " *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (quoting *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). In this two-part calculus, a dispute is capable of repetition if "there [is] a reasonable expectation that the same complaining party would be subjected to the same action again," and evades review if "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (*per curiam* ).

▪ Under the capable of repetition prong, a party must show a reasonable expectation "that the same parties will engage in litigation over the same issue in the future." *Pharmachemie B.V. v. Barr Laboratories,* 276 F.3d 627, 633 (D.C.Cir. 2002) (citing *Norman v. Reed,* 502 U.S. 279, 288, 112 S.Ct. 698, 116 L.Ed.2d 711

(1992)). Given the extent of copyright piracy occurring over the Internet today, and given that Verizon has 1.7 million customers, it is certainly likely that RIAA, which represents the vast majority of copyright owners of music, will serve more subpoenas, and attempt to enforce them, against Verizon in the future. In fact, since RIAA served these two subpoenas on Verizon, it has filed four others on Verizon seeking the identity of alleged infringers. *See* Civil Action Nos. 03–MS–0071, 03–MS–0079, 03–MS–0088, and 03–MS–0089 (D.D.C.2003).[28] There is plainly "a reasonable expectation" that Verizon "would be subjected to the same action again." *LaRouche v. Fowler,* 152 F.3d 974, 978 (D.C.Cir.1998).

▪ Under the "evading review" prong of the mootness exception, the question is whether "the challenged activity is *by its very nature short in duration,* so that it could not, or probably would not, be able to be adjudicated while fully live." *Id.* at 978 (emphasis in original). In the absence of a stay, RIAA's subpoenas probably would not be able to be adjudicated while fully "live," because user identities would be disclosed, satisfying the subpoena. This inquiry addresses the particular activity's temporal duration, that is, "[h]ow quickly must an activity begin and end to evade judicial review," and "evading review means evading Supreme Court review." *Campbell v. Clinton,* 203 F.3d 19, 33 (D.C.Cir.2000) (Tatel, J., concurring). The context here—copyright infringement over the Internet—is inherently one that

---

**27.** Notwithstanding RIAA's commitment, the Court recognizes that mootness goes to the jurisdiction of the Court of Appeals and hence must be considered even if not asserted by the parties.

**28.** Verizon's counsel has conceded that this litigation is capable of repetition. Hearing

Tr., Mot. to Stay, 02–0323 (Feb. 3, 2003), at 37. Indeed, the potentially large number of these subpoenas was one of the parade of horribles Verizon has cited to illustrate the burden Internet service providers face under RIAA's construction of the DMCA. *See* Opp. to Motion to Enforce at pp. 11–13.

likely evades review. Section 512(h) expressly and repeatedly (in eight separate references) mandates that the subpoena process occur "expeditiously," for it is critical to curtail infringement as quickly as possible, given "the ease with which digital works can be copied and distributed worldwide virtually instantaneously." S.Rep. No. 105–190, at 8. The very nature of the speed, and worldwide scope, of copyright piracy over the Internet means that these subpoena issues could not be adjudicated while fully "live" (unless stays were routinely entered).[29] If subpoenas could not be enforced pending the sometimes glacial pace of full appellate review, there would be little point in seeking enforcement in the first place—it would simply take too long to protect copyrights.

### 3. Harm to RIAA

The harm to RIAA, and the copyright owners it represents, from a stay is comparatively more substantial than any harm to Verizon absent a stay. The extent of copyright infringement and piracy of music recordings over the Internet has skyrock-

eted, resulting in enormous losses for the industry. Most importantly, if the Court entered a stay, the apparent infringement of numerous copyrighted works made available over the Internet for universal downloading could continue unabated. Unauthorized use of a copyrighted work has long been presumed to constitute irreparable harm.[30] The value of these copyrighted works could plummet further, as they are made available (at the push of a button) for the taking. Given the extensive losses to Internet piracy, the relative harm to RIAA and copyright owners is significant and more than counter-balances Verizon's claimed harm. *See Delaware River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 924 (D.C.Cir.1974) ("Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents.") (citing *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir. 1958)).[31]

---

29. *See, e.g., Jefferson v. Abrams*, 747 F.2d 94, 96 (2nd Cir.1984) (in challenge to procedures for nominating candidates for special election to Congress, court reasoned that "the very speed with which such elections must be conducted makes the problem of constitutional defects in nomination procedures peculiarly one 'capable of repetition, yet evading review'") (citing *Montano v. Lefkowitz*, 575 F.2d 378, 382 (2d Cir.1978)).

30. *See Health Ins. Ass'n of Am. v. Novelli*, 211 F.Supp.2d 23, 28 (D.D.C.2002) ("In copyright infringement cases, a copyright holder may be presumed to suffer irreparable harm as a matter of law when his right to the exclusive use of copyrighted material is invaded."); *Taylor Corp. v. Four Seasons Greetings*, 315 F.3d 1039, 1041–42 (8th Cir.2003) (for purposes of injunctive relief "[i]n copyright-infringement cases, the general rule is that a showing of a prima facie case raises a presumption of irreparable harm"); *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 66 (2nd Cir.1996) (same).

31. Verizon's assertion that RIAA and copyright owners will not be harmed because there is a three-year statute of limitations for prosecuting copyright infringement ignores the fact that monetary damages or the recovery of royalties are not realistic remedies here. It is highly unlikely that the two individuals alleged to be infringing the copyrights of more than 600 and 800 songs respectively are in a position to pay royalties and statutory damages—at $150,000 per violation—should RIAA pursue an infringement action. Moreover, the availability of money damages will not generally overcome irreparable injury resulting from copyright infringement. *See Cadence Design Systems v. Avant! Corp.*, 125 F.3d 824, 827 (9th Cir.1997) ("a defendant cannot, by asserting the adequacy of money damages, rebut the presumption of irreparable harm that flows from a showing of likelihood of success on the merits of a copyright infringement claim").

If a stay is entered, it is foreseeable that other service providers presented with subpoenas under the DMCA will seek a stay of enforcement pending appellate resolution of this "test" case.[32] Meanwhile, copyrighted works would remain open to infringement over the Internet.[33] In that setting, a stay could, effectively, serve as an injunction against any use of DMCA subpoena authority until a Court of Appeals decision, a scenario inconsistent with this Court's assessment of Congress's intent. "Every day [the stay] remains in force the clearly expressed intent of Congress is being frustrated." *Heckler v. Turner*, 468 U.S. 1305, 1309, 105 S.Ct. 2, 82 L.Ed.2d 891 (1984) (Rehnquist, J., in chambers). Even though an issue of first impression may be presented here, there is negligible harm to Verizon absent a stay, particularly in contrast to the ongoing harm facing RIAA and copyright owners (by way of unabated piracy).

### 4. The Public Interest

Finally, the public interest will best be served by denying Verizon's request for a stay. Under the public interest prong, the views of "Congress, the elected representatives of the entire nation," are "another sense by which public interest should be gauged." *Cuomo*, 772 F.2d at 978. "[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.' " *United States v. Oakland Cannabis Buyer's Co-op.*, 532 U.S. 483, 497–98, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001) (quoting *Virginia R. Co. v. Railway Employees*, 300 U.S. 515, 551, 57 S.Ct. 592, 81 L.Ed. 789 (1937)).[34]

It would not be in the public interest to alter the trade-offs Congress carefully crafted in the DMCA. As this Court has stated, "in exchange for complying with subpoenas under subsection (h), service providers receive liability protection from any copyright infringement .... Hence, any additional burden [on service providers] is offset by that [liability] protection, which, of course, is exactly the contemplation reflected in the structure of the DMCA." *First Subpoena Decision*, 240 F.Supp.2d. at 34 n. 6.[35] The legislative history of the DMCA reflects the congressional balancing of the interests of service providers, copyright owners, and Internet users: "the Committee believes it has appropriately balanced the interests of content owners, on-line and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet." H.R.Rep. No. 105–551(II), at 21. It would not serve the public interest for Verizon to continue to receive the benefits of the legislation—liability protec-

---

**32.** It appears that Earthlink, another service provider, may refuse to comply with DMCA subpoenas until the Court of Appeals rules. *See* RIAA Opp. to Verizon Mot. to Stay, Ex. A, ¶¶ 4–10 (Whitehead Decl.).

**33.** Although Verizon has notified both of the alleged infringers, only one has agreed to stop, in the future, making works available over the Internet pending complete resolution of the subpoenas.

**34.** Indeed, in the context of a stay, "[t]he presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating suc-

cess on the merits, but an equity to be considered ... in balancing the hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324, 105 S.Ct. 11, 82 L.Ed.2d 908 (1984) (Rehnquist, J., in chambers).

**35.** Other courts have recognized the trade-offs embodied in the DMCA, giving service providers copyright liability protection in exchange for assisting copyright owners to identify infringers. *See ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir.2001); *United States v. Elcom Ltd.*, 203 F.Supp.2d at 1124.

tion—without the concomitant obligations of disclosing the identity of an alleged infringer.

> A district court cannot, for example, override Congress' policy choice, articulated in a statute .... Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is ... for the courts to enforce them when enforcement is sought.' *Courts of equity cannot, in their decision, reject the balance that Congress has struck in a statute.*

*Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 497, 121 S.Ct. 1711 (emphasis added) (quoting *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)).[36]

In fact, it is well-established that "the public interest is in the interest in upholding copyright protections." *Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1499 (10th Cir.1993); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir.1983) ("It is virtually axiomatic that the public interest can only be served by upholding copyright protections."); *Control Data Sys. v. Infoware, Inc.*, 903 F.Supp. 1316, 1326 (D.Minn.1995) ("the public interest is furthered by enforcing copyright laws and preventing the infringement of copyrighted materials"). Of course, copyrights serve as important incentives encouraging creativity and protecting free speech, which furthers the public interest. "By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Eldred*, 123 S.Ct. at 788. In short, the Court concludes that the public interest is best served by respecting the balance struck by Congress through the DMCA, and in upholding statutory copyright protections which encourage the dissemination of ideas. That conclusion warrants not only a rejection of Verizon's claims on the merits, but also rejection of the stay request based on an assessment of the public interest.

## CONCLUSION

Verizon's motion to quash RIAA's February 4, 2003 subpoena is denied. The Court finds that § 512 of the DMCA, as construed by this Court in its *First Subpoena Decision*, does not violate the "case or controversy" requirement of Article III of the Constitution, and does not abridge the First Amendment rights of Internet users. Because Verizon cannot demonstrate that it has a substantial likelihood of prevailing on the merits of its statutory or constitutional claims, and has not shown that it will be irreparably harmed if a stay pending appeal is not granted, Verizon has not met its heavy burden "to justify the court's exercise of such an extraordinary remedy." *Cuomo*, 772 F.2d at 978. Verizon's request for a stay pending appeal is therefore denied.

---

**36.** The public interest is also advanced by the considerable deference courts have long afforded Congress in regard to the scope of copyright law, particularly when it comes to new technologies. *See Eldred*, 123 S.Ct. at 772 ("[w]e defer substantially to Congress"); *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 431, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) ("Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials."). In other words, courts "are not at liberty to second-guess congressional determinations and policy judgments" regarding copyright issues, and "it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives." *Eldred*, 123 S.Ct. at 782–83. "Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably complicated by such new technology." *Sony*, 464 U.S. at 431, 104 S.Ct. 774.

Separate orders in this case and in Civil Action No. 02–MS–0323 (JDB) have been issued on this date.